Our last case is 5-21-02-72. Keep alert and stay alert. Are you ready to proceed? All right, please state your name for the record and you may do so. May it please the court. Counsel. My name is Jennifer Lassie and I represent the defendant's appellant, Mr. Lee Davis. Due to time constraints, I will be focusing on arguments 1 and 2 today. Given the evidence in the light most favorable to the state, there was insufficient evidence to prove that Mr. Davis possessed the gun found in the alley. Mr. Davis never made any incriminating statements to police that he owned or possessed the gun. Officers never saw him holding or discarding the gun or even making furtive movements with his arms. The state's theory was that Mr. Davis discarded the gun when he fell in the alley. Was he being chased at that time or was he trying to outrun a policeman? He was. Both Officers Song and Kelly were pursuing Mr. Davis down the alley. Did he get out of the car that they were trying to stop or something? His vehicle was parked on the side of the road and officers began walking towards him and at that point he exited his vehicle and started walking. They did identify themselves. I thought he started running. He started walking away from his car and then began running from police as they pursued him. Then he ran down an alley. That's correct. Then he cut through a yard or something like that? He did. So he went through a yard and in between what was a house that appears abandoned and another house that's in great disrepair and runs down this alley. Officers have him in their sights at almost all times except for a mere matter of seconds. One officer testified he lost sight of Mr. Davis for 5 to 10 seconds and the other officer who was closer to Mr. Davis said he lost sight of him for mere seconds. Was there anything found in the car? There was no testimony about anything found in the car. Wouldn't it have been a fair inference for the jury to conclude that the defendant got rid of the gun? That's why you ran down the alley to get rid of the gun. Well, that's insufficient evidence to prove constructive possession. Mere presence in the vicinity of the gun is not enough and the state did not need its burden here. And there are other important circumstances in this case. For example, again, officers never saw Mr. Davis holding a gun or making gestures that would indicate he was throwing the gun. This was a high call area where officers were called to investigate frequently. There was no testimony about when someone had last been in that alley to indicate that there hadn't been a gun before Mr. Davis ran through it. Not only that, the gun wasn't on the alley path. The gun was over to the side in the grass. Was it within throwing range or did they talk about that? So they discuss how far down the alley from in between the houses that the gun was found, which is about 50 feet, but they don't discuss how far off the alley that the gun was found. 50 feet from the alley? 50 feet down the alley from in between the two houses. How far was it from his pathway through the alley? The officers don't testify about that, but we know that he runs down this gravel alley that's dusty and this gun is over to the side in the grass and among the leaves. Was the jury shown photographs or diagrams of the scene? So that's an interesting question and a good question. The photographs, the officers photographed the gun up close on the night that the gun was found after the chase. However, the officers did not come back and photograph that alley until three months later. And it's at that point that officers photograph what is a pothole, and the state tries to argue that this pothole in these pictures three months later must have been there three months earlier. Mr. Davis must have fallen in this pothole and must have thrown the gun when he fell. Even though officers never saw him fall, the officers were right behind him and they themselves never fell. And again, no one saw Mr. Davis throw the gun. Officers lost sight of him for seconds. And when they regained sight... Now you're arguing that he didn't fall. Is that what you're saying? There's no evidence that he fell in the alley. Didn't he have skinned hands or something like that? So he did have scrapes. Knees? He did have some scrapes on his knees and hands. However, he was forced onto the ground at his vehicle when he was taken into custody. I'm sorry. I'm sorry I didn't hear that. He did have scrapes on his knees and on his hands. However, he was forced onto the ground at his vehicle. So you think the scrapes came from when he was forced onto the ground? It's entirely possible. Also, falling still isn't evidence that he got rid of a gun. You know, even if he had fallen in that alley, like I said, the officers, one lost sight of him for five to ten seconds. The other one would have lost sight of him for even a shorter amount of time because that officer was closer. And that officer said he lost sight of him for a matter of seconds. And, again, officers never saw him falling or getting up from a fall or, more importantly, discarding a gun or making any sort of gestures with his arms that would indicate he was discarding a gun. And they never saw him holding a gun. And there's more important facts surrounding this gun, too. So not only was it in an alley in between one house that appeared abandoned and another house that was in great disrepair. This is a high cold area where police are frequently called for crimes. The alley was littered with trash and deteriorated furniture. So this gun could have been here for some time without being noticed. And the state's own expert testified about the DNA mixture on the gun. There was DNA on this gun from at least three people. However, the DNA was so degraded due to exposure from the elements that they couldn't identify the DNA. And this suggests that the gun had been there for some time. Now, what was the reason for, first of all, the car wasn't stopped already? So the officers responded to a call that Mr. Davis was in the area, and Mr. Davis had a warrant for his arrest. The car wasn't moving when they first saw it. That's correct. This was not a traffic stop. It was stopped, and he was in the car. Correct. Yeah, this was a traffic stop. This was not a traffic stop. I apologize. This was, I believe, 2 or 3 in the morning, a couple blocks from a bar on a Saturday night. And officers were informed that Mr. Davis was in the area and had a warrant for his arrest, and so they responded for that reason. So the car was stopped. He was in the car when they first saw it? He was in the car when the police first saw him. I believe the record says that two officers parked at the nearby tavern and began walking on foot to approach him, and another officer drove down the street in a marked car. I think it was a marked car. But he got out of the car and ran. Yeah, he got out of the car and crossed the street. It seems like he was walking at first and then began running once he reached a yard. So with the evidence the State presented below, no rational trier of fact could have found beyond a reasonable doubt that Mr. Davis possessed this gun. Mere vicinity in the presence of the gun, or mere vicinity in the area where the gun, mere presence in the area where the gun was found is not enough. This case is not like the Anderson case. In the Anderson case, the one cited by the State in the briefs, the officer saw the defendant with both of his hands in his stomach area. The officers were behind him. He ran, tripped over a brush pile, and fell, and officers walked up right then and found the gun just two to three feet in front of Defendant Anderson. This is not the same thing here. Mr. Davis ran down an alley, and officers later went down that alley and found a gun off into the grass to the side of that alley. And again, this alley was littered with trash, and the DNA on this gun was so degraded that that suggests it had been out there for a long time. Was the gun loaded? I believe the gun was loaded. In Mr. Davis's second argument, he asserted that errors by both trial counsel and the court denied him a constitutional right to a fair trial and a verdict worthy of confidence. The problem here is that trial counsel fell to object to the admission of Mr. Davis's prior conviction. I'm sorry to keep bothering you. What was the warrant for? I do not recall, Your Honor. I apologize. I don't know if officers testified about that. Oh, okay. But they do testify about the warrant existing several times and about using Mr. Davis's in-house booking photos to identify him, which is part of our second argument, the repeated references to the warrant and repeated references to officers' viewing booking photos, which suggests that Mr. Davis has a lengthy criminal history, which is improper for jurors to hear. Significantly, though, trial counsel fell to object to the admission of Mr. Davis's prior conviction for possession of a weapon on the ground that it was irrelevant and prejudicial propensity evidence, which is exactly what the State used it for at trial. At the pretrial hearing, the State claimed it would use this prior conviction to show intent, absence of mistake, modus operandi, or knowledge, but the State never explained how this prior conviction would do that. For example, in some of the cases cited in the briefs, I'm sorry for the rumble. Thank you. All right. Appellee, please state your name for the record, and you may proceed. Thank you. Police, the Court, Counsel, my name is Becky Ray, and I represent the people. And I would first like to address counsel's sufficiency of the evidence argument. The defendant asserts that the State failed to prove his armed habitual criminal offense because it didn't prove he possessed the firearm. When a defendant attacks the sufficiency of the evidence, the standard of review is whether any rational trial or fact could have found the defendant guilty, could have found all of the elements of the offense, and found the defendant guilty beyond a reasonable doubt when viewing the evidence in the light most favorable to the prosecution. In this case, viewing the evidence in that light, the circumstantial evidence overwhelmingly supported the defendant's possession of the firearm. When officers first encountered him, the charger was stationary. It was not a traffic stop. As the officers approached on foot from where they had parked their patrol car, the defendant exited the charger and began walking away from officers. He was slumped over and bent over as he was walking away, even though officers were telling him to stop. His right hand was up by his face, trying to conceal his identity, presumably according to counsel's reply brief. And his left hand and left arm were not visible. The fact that he was attempting to hide his identity, possibly, the jury could infer from that that he was doing something nefarious or criminal as he was fleeing from officers, and that shows a consciousness of guilt. The fact that he was slumped over with at least one of his arms and hands not visible, the jury could reasonably infer that he was trying to conceal or secure a weapon. It's just common sense that if you're trying to walk away from someone quickly, as this defendant was, that it's unnatural to run in that slumped over, bent over position and not using your arms to propel you forward. So it just shows that there was something more going on than the defendant was just trying to run away. He was trying to do something to conceal or hide at least his identity or something that he possibly was carrying away from the scene. What about the degradation of the DNA? Doesn't that, does the jury ignore the inference that the gun had to have been there a lot longer than the time the defendant was in the alley? I don't think the jury ignored that, but I think there's a reasonable explanation for that. Winters, when he testified that the DNA was degraded, did not say when that exposure to the elements had to have occurred. The defendant could have possessed the weapon on that night and discarded it in the alley that night as he was running away from police, and the DNA on it could still have been degraded from prior exposure to those elements. There was no testimony whatsoever that it had occurred immediately prior to the discovery. Additionally, the defendant was found with gloves and a mask on his person, so certainly the DNA from previous handling of that gun could have been degraded from the elements prior to that, and the gloves that the defendant had in his possession could have kept any current DNA or fingerprint evidence, of which there was none, that was testable from showing up on the gun. When they arrested him, he didn't have the gloves on, did he? He did not have the gloves on. They were found in his pocket along with the mask, and just like the defendant, whose clothes were dusty and dirty and his arms and legs were dusty and dirty and they had scrapes on them, the gloves and the mask were both dusty and dirty. Additionally, when they located the firearm, there was a piece of green grass stuck in the hammer or the mechanical workings of the gun, and there was also grass on the mask, and that can be seen in the exhibits that were admitted at trial, which the jury was able to view. Additional evidence... And these photographs were taken the same night of the arrest? The photographs of the gun and the photographs of the mask and the gloves, yes, Your Honor, they were. And so they didn't pick fresh green grass on the gun? Pardon me? Fresh green grass on the gun? There was a blade of green grass stuck in the hammer of the gun, and that is visible in the photograph. Okay. Additionally, once the defendant was past the location where the officers found the gun after the pursuit, there was no indication that the defendant continued to run in that slumped-over manner with his left arm and hand hidden. As a matter of fact, the officers testified that the defendant continued to put distance between himself and them, so he was clearly moving a lot faster than the officers were as he fled. Additionally, I addressed this in my brief as well as counsel, discussing whether or not the defendant fell. Whether or not the defendant fell is not an element that the State had to prove. It was simply a theory that they espoused at trial, and the circumstantial evidence does support that, but there is no requirement that the defendant had to have fallen for that gun to have been attributed to him and being in his possession. The front of the defendant's clothes was dirty, like I said, dirty and dusty. His knees were freshly scraped and bleeding, as was one of his arms. And the gun was found within two feet of the alleyway where the defendant ran when he was fleeing from officers, and this testimony that it was found within two feet of the alleyway came from Officer Song, who was one of the officers that was pursuing the defendant. And that can be found in the record at 324 and 325 and also 389. Additionally, with the exception of the grip of the gun, the gun also appeared dusty and dirty, like the defendant's clothes, the mask, and the gloves. As I said, the gun was found within a couple of feet of the pathway along the alleyway along which the defendant ran when he was fleeing. It was in plain view. It was not concealed by grass or leaves or debris or any discarded furniture. It was in plain view, and there's photographs of that as well that were shown to the jury, the same ones that I believe had the blade of grass showing in it. I know there were at least a couple of photographs. So how about that blade of grass? If it had been there for a long time, as counsel asserts, I do believe that that blade of grass, by common sense, would have been brown or dead by the time the officers found it. I think the fact that it was found still green and fresh shows that the gun had only recently been discarded. And while it was a high-call area, the officers did not necessarily, or they didn't say that it was a high-crime area. They also had said that they had never located any discarded loaded weapons in that area before. While they didn't look for them, they had never found any when they had been called to that area. Additionally, regarding the mask and the gloves, it was June. It wasn't necessary for the defendant to have those items to keep himself warm. He was also dressed in a short-sleeved T-shirt and shorts. Additionally, that clothing doesn't indicate that he was maybe a cold-natured person and needed gloves or a mask in June. So what was the reason the defendant had those? I submit to you it was helpful to have those to keep the DNA and fingerprints off of this weapon that he possessed, that he knew he was going to be in trouble for if it was found on him. The fact that he fled from officers as they approached and did not stop when they told him to shows that he had a guilty conscience. And more importantly, I think, once he discarded that weapon along the pathway where he was running, he returned to the very spot where the pursuit had started and sat in the vehicle with the door open as if giving up the fight. Once he had finished discarding the gun, which he had in his possession, he just sat and waited for officers to apprehend him. That, again, shows that when he fled, he was doing so with the knowledge that he possessed this gun and had to get rid of it. And by the time he got back to the vehicle, he no longer had it, and he waited for the officers to come and get him. I do believe the circumstantial evidence in this case was overwhelming against him, and I would ask this court to affirm his conviction and sentence. Counsel, the defendant argued, did a pro se file, and said defense was not effective to save the waste. How did that not prompt a crankle in the court? I think it was vague. I think the fact that the documents that he filed said appeal in them. That's form, of course, not substance. But it had appeal in the title, and his prayer for relief was asking the court to grant his appeal. And then substantively, I think he was not claiming defense counsel was ineffective. I think he was claiming that his defense against possession of the gun was ineffective, but I think. Couldn't it be reasonable to infer he was saying my attorney was ineffective because if he had filed, he should have filed a motion to dismiss. I mean, if he had said he should have filed a motion to suppress, wouldn't that absolutely trigger a crankle inquiry? I interpret what he wrote in his pro se motion differently. The way I interpret it, it seems to me that the defendant is saying that the state allegedly committed a violation, which caused his defense attorney not to be able to file that. But isn't that precisely the point? That's why the crankle inquiry should have occurred, to ascertain the intent, hear the interpretation. My belief is that what he said in his written motion was so vague that because he talked about counsel would have been successful if he had filed that motion, if the state had complied with the discovery allegedly, that I don't think that it can be interpreted as ineffective assistance of counsel, as much as it was an allegation of noncompliance with discovery against the state. That's the state's interpretation of his wording in the motion. Isn't the standard to trigger a crankle a very low threshold? It is, but I don't think that the defendant meant it in this case. Based on the context of the other items in the motion, all of the other things in his motion discussed the sufficiency of the evidence, and viewed in that light, this assertion also was discussing the sufficiency of the evidence, the fact that the state allegedly did not share that evidence with the defendant, so that his attorney could file the motion to dismiss. Any other questions? All right. Thank you. Thank you. Rebecca? I wanted to briefly address the crankle issue. This was a clear ineffective assistance of counsel claim. The filing by the defendant said, defense was not effective, to say the least. And then the very next sentence was, he. So the very next sentence started with he, and Mr. Davis starts talking about what counsel failed to do. The defense is not effective, to say the least. There's only one person in charge of presenting the defense, and that is defense counsel. The state is splitting hairs when it says that crankle inquiry was not required here. This was sufficient to trigger the trial court's duty to inquire. With respect to the reasonable doubt argument, the state puts a lot of emphasis at the trial court on this falling in the pothole and this blade of grass. And if I recall correctly, this blade of grass appears in the photo exhibit when the police have picked the gun up from the ground. So it's not as though officers did photograph the gun on the ground, and, you know, you see it in the grass. However, this blade of grass that we're focusing on saying this fresh blade of grass in the hammer must indicate the gun was recently placed here. We don't know if that blade of grass grew up through the gun, and if it was plucked from the ground when officers picked up the gun. There's no testimony about this blade of grass. It's not enough to show that Mr. Davis possessed this gun. And again, when we consider the rest of the circumstances, the fact that officers had him in their sights for almost the entire pursuit but for a mere matter of moments, and that officers never saw him making any gestures that would indicate somebody was discarding a gun, you know, throwing his arms. While the officers saw him slumped and maybe covering his face, they never saw him holding a gun. And as we note in the briefs, that could have been perhaps because he was trying to slump and conceal his very distinct height. I believe he's 6'7", and the officers never testified that he continued to have one hand down as he ran down the alley. The officers never indicated he had his hands at his waist as he ran down the alley. It was just when he was initially crossing the street, he appeared slumped and covering his face. But there's no testimony that he continued to keep a hand at his waist as he ran. And again, officers never saw him fall and never saw him discard a gun. As for his second argument, this is where the evidence is so important. The evidence here was not overwhelming in this case. If it were, we wouldn't be arguing the reasonable doubt in Argument 1. And that's incredibly important because the State used irrelevant prejudicial propensity evidence. The State used a prior conviction for possession of a weapon to argue that that shows that Mr. Davis possessed the gun here. But the State didn't present any evidence of that conviction. Other than just to tell the jury about the conviction, the State didn't produce any facts surrounding that conviction. For example, in some of these cases, the State would introduce prior conviction evidence saying, hey, the defendant possessed a gun and kept it in his vehicle before, and officers found the gun in this case in his vehicle. And that shows that prior conviction is relevant to the present charge. We don't have anything like that in this case. The court and counsel and State allowed the State to introduce this evidence like you would impeachment evidence. They simply introduced, hey, he's got a prior conviction for possession, so he must have possessed this gun here. And the State makes that clear in its closing argument, saying, would a person who has previously been convicted of unlawful possession of a weapon know the importance of not having your DNA on a weapon? That might be relevant if the State had shown facts that in the previous case he used gloves to keep his DNA off that weapon in that conviction. But we don't have any of that because the State didn't produce any facts, any witnesses about that prior conviction. They just used the fact of a prior conviction and used it as propensity evidence. Did Your Honors have any questions? Of course. Thank you. Thank you, counsel. All right. We will take this matter under advisement if you're willing to do courts. And with that, I believe that concludes our topic for today. The court will stand in recess until 9 a.m.